```
         IN THE UNITED STATES DISTRICT COURT FOR THE
                   SOUTHERN DISTRICT OF GEORGIA
                          AUGUSTA DIVISION

RICHARD COX and KATHLEEN COX,     *
                                  *
     Plaintiffs,                  *
                                  *
          v.                      *      CV 121-126
                                  *
ALLSTATE VEHICLE AND PROPERTY     *
INSURANCE COMPANY,                *
                                  *
     Defendant.                   *
                                  *
```

## O R D E R

Richard Cox and Kathleen Cox (collectively, "Plaintiffs") brought this action against their property insurer, Allstate Property and Casualty Insurance Company ("Allstate"), based upon Allstate's refusal to cover the damage resulting from a water leak at Plaintiffs' house. (Doc. 1-1, at 2-4.) Allstate has filed a motion for summary judgment that is presently pending before the Court. (Doc. 25.) For the reasons set forth below, Allstate's motion for summary judgment is **GRANTED**.

### I. BACKGROUND

On May 27, 2020, Allstate provided a House and Home Policy ("Policy") for Plaintiffs' house located at 301 Warren Road, Augusta, Georgia ("Property"), and Plaintiffs thereafter paid

premiums to Allstate. (Doc. 31, at 1-2; Doc. 32, at 1-2.) The Policy provides, in relevant part:

> B. Under Dwelling Protection-Coverage A and Other Structures Protection-Coverage B of this policy, we do not cover any loss consisting of or caused by mold, fungus, wet rot, dry rot or bacteria. This includes any loss which, in whole or in part, arises out of, is aggravated by or results from mold, fungus, wet rot, dry rot or bacteria.
>
> This exclusion applies regardless or whether mold, fungus, wet rot, dry rot or bacteria arises from any other cause of loss, including, but not limited to, a loss involving water, water damage or discharge, which may otherwise be covered by this policy, except as specifically provided in Section I Conditions, Mold, Fungus, Wet Rot And Dry Rot Remediation As A Direct Result Of A Covered Water Loss.
>
> \*\*\*
>
>> 19. Mold, Fungus, Wet Rot And Dry Rot Remediation As A Direct Result Of A Covered Water Loss
>> In the event of a covered water loss under Dwelling Protection-Coverage A, Other Structures Protection-Coverage B or Personal Property Protection-Coverage C, we will pay up to $10,000 for mold, fungus, wet rot or dry rot remediation.
>
> \*\*\*
>
> Losses We Cover Under Coverages A and B:
>
> We will cover sudden and accidental direct physical loss to property described in Dwelling Protection-Coverage A and Other Structures Protection-Coverage B except as limited or excluded in this policy.
>
> Losses We Do Not Cover Under Coverages A and B:
>
> \*\*\*
>
> D. Under Dwelling Protection-Coverage A and Other Structures Protection-Coverage B of this policy, we do not cover any loss consisting of or caused by one or

2

more of the following excluded events, perils or conditions. Such loss is excluded regardless of whether the excluded event, peril or condition involves isolate or widespread damage, arises from natural, man-made or other forces, or arises as a result of any combination of these forces.

\*\*\*

> 5. a) Wear and tear, aging, marring, scratching, deterioration, inherent vice, or latent defect;
> b) mechanical breakdown;
> c) growth of trees, shrubs, plants or lawns, regardless or whether such growth is above or below the surface of the ground;
> d) rust or other corrosion;
> e) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs, or ceilings; or
> f) insects, rodents, birds, or domestic animals. We do cover the breakage of glass or safety glazing materials caused by birds.
>
> If any of a) through f) causes the sudden and accidental escape of water or steam from a plumbing, heating or air conditioning system, a household appliance or an automatic fire protective sprinkler system within your dwelling, we cover the direct physical damage caused by the water or steam.
>
> If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of your dwelling necessary to repair the system or appliance. This does not include damage to the defective system or appliance from which the water or steam escaped.
>
> \*\*\*
>
> 8. Seepage, meaning continuous or repeated seepage or leakage over a period of weeks, months, or years, of water, steam or fuel:
> a) from a plumbing, heating, air conditioning, or automatic fire protective sprinkler system or from within a domestic appliance; or

3

>    b) from, within or around any pluming fixtures, including, but not limited to, shower stalls, shower baths, tub installations, sinks or other fixtures designed for the use of water or steam.

(Doc. 25-1, at 13, 15, 25, 27-28.)

In June 2020, Plaintiffs' monthly electricity bill, usually around $250 - $260 for that time of year, increased to $427.79, and the next month's bill increased to $525.84. (Doc. 31, at 2.) Because of the continued increases, Mr. Cox called Mobley Mechanical to get an estimate to replace the HVAC ductwork. (Id.) Mobley Mechanical accessed the crawlspace at the Property on July 17, 2020 and July 24, 2020 to provide estimates and did not notice a water leak during either visit. (Id.) Plaintiffs' electricity bill for July 16, 2020 to August 14, 2020 increased to $630.46. (Id. at 3.)

Sometime between September 8, 2020 and September 9, 2020, Mr. Cox went into the crawlspace at the Property and found three HVAC delivery lines disconnected and blowing cold air into the crawlspace. (Id. at 4.) He also found the crawlspace was "saturated, with mold throughout the crawlspace." (Doc. 30, at 2.) Mr. Cox repaired the ductwork, and according to Plaintiffs, this is when Mrs. Cox noticed the hardwood floors had been cupping. (Doc. 31, at 4; Doc. 32, at 3.) However, despite Mr. Cox's repairs, Plaintiffs' electricity bill was still higher than normal. (Doc. 31, at 4; Doc. 32, at 3.) Subsequently, Mr. Cox "learned that the

4

thermostat to his hot water heater was stuck open, which caused the water heater to continuously run in an effort to achieve the desired temperature." (Doc. 30, at 2-3.) Mr. Cox replaced the thermostat and heating elements in the hot water heater, but "the electricity usage was not where [he] thought it should be." (Doc. 31, at 5.) On September 25, 2020, Mr. Cox went into the crawlspace again and found the hot water line was broken and repaired it that day. (Id. at 5-6.) Following the repairs, the next electric bill was under $200. (Id. at 6.)

On October 2, 2020, William Welsh of Puroclean visited Plaintiffs' Property and went into the crawlspace. (Id.) Mr. Welsh saw "mold uniform everywhere." (Id.) Although Mr. Cox had repaired the hot water line, Mr. Welsh found "the uniform mold that was present was consistent with a pinhole leak in the hot water line." (Id. at 7.) On the same day as Mr. Welsh's visit, Plaintiffs reported the loss to Allstate. (Id. at 9.) On October 7, 2020, Allstate's adjuster Mark Williams inspected Plaintiffs' Property. (Id.) Like Mr. Welsh, Mr. Williams also saw mold throughout the crawlspace. (Id. at 9-10.) "Based on his experience as a claims adjuster and his inspection of the Property, Mr. Williams determined the loss was not sudden, but was long term and not covered under the [Policy,]" and Allstate denied Plaintiffs' claim. (Id. at 10.) The denial letter identified

5

three reasons[1] for the denial of coverage: (1) "damages resulting [from] or caused by repeated or continuous seepage or leakage of water," (2) "damage consisting of mold, mildew and fungus," and/or (3) "[damages] resulting or caused by faulty, inadequate or defective planning, workmanship, materials or maintenance." (Doc. 30-5, at 2.)

On June 7, 2021, Plaintiffs filed suit in the State Court of Richmond County, State of Georgia. (Doc. 1, at 1.) The case was removed to this Court pursuant to 28 U.S.C. § 1446(b)(3) and Fed. R. Civ. P. 6(a)(1)(c). (See id.) In their complaint, Plaintiffs claim the damage to their property is covered under the Policy and that Allstate's denial of coverage constituted a bad-faith breach of the Policy. (See Doc. 1-1, at 3-5.) Allstate now moves for summary judgment, arguing that the Policy clearly excludes coverage for the loss Plaintiffs claim. (See Doc. 25, at 12-17.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the

---

[1] Plaintiffs allege in their response that the denial letter had four reasons for denial and include "wear and tear." (Doc. 30, at 4.) However, the denial letter Plaintiffs attached as an exhibit to their response only indicates three reasons for the denial. (Doc. 30-5, at 2.)

6

to property . . . ." (Doc 25-1, at 25.) Allstate states the language is unambiguous and clear, and Plaintiffs raise no arguments in opposition. (Doc. 25-2, at 11.) Therefore, because the term "sudden" is unambiguous and clear and not defined in the Policy, it is given its "ordinary and customary meaning." See W. Pac. Mut. Ins. Co. v. Davies, 601 S.E.2d 363, 367 (Ga. Ct. App. 2004) (quotation marks and citation omitted) ("Unless otherwise defined in the contract, terms in an insurance policy are given their ordinary and customary meaning[,]" and in identifying the "ordinary and customary meaning" of a term, courts turn to dictionaries "because they supply the plain, ordinary, and popular sense" of a term."). According to the Merriam-Webster Online Dictionary, "sudden" means "happening or coming unexpectedly," "changing angle or character all at once," "marked by or manifesting abruptness or haste," or "made or brought about in a short time." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/sudden (last visited March 8, 2023).

Applying the "ordinary and customary meaning," Allstate argues the Policy does not cover Plaintiffs' loss because "the damage was not brought about in a short time," and therefore, not "sudden." (Doc. 25-2, at 13-14.) In response, Plaintiffs argue that their expert, Mr. Welsh, opined that "the initiation of the loss would have been sudden . . . ." (Doc. 30, at 12.) Allstate

11

governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation and internal quotation marks omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to

7

judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. Id. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17 (citation omitted). The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule

of Civil Procedure 56.

"In the insurance context, the burden of proof is upon the plaintiff to prove that he has sustained a loss covered by the policy." Matthews v. State Farm Fire & Cas. Co., 500 F. App'x 836, 840-41 (11th Cir. 2012) (citation omitted and alterations adopted). However, the insurer bears the burden to prove that a policy exclusion applies to the facts of the case. Haulers Ins. Co. v. Davenport, 810 S.E.2d 617, 619 (Ga. Ct. App. 2018) (quoting Interstate Life & Accident Ins. Co. v. Wilmont, 180 S.E.2d 913, 914 (Ga. Ct. App. 1971)) ("Where the insurer seeks to invoke an exclusion contained in its policy, it has the burden of proving the facts come within the exclusion.").

"Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions." Preis v. Lexington Ins. Co., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007). Essentially, the Court has no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment." Id. (citing Resol. Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)). Accordingly, the Court will only review the materials the Parties have specifically cited and legal arguments they have expressly advanced. See id.

In this action, the Clerk of Court provided Plaintiffs notice of the motion for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 26.)  For that reason, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985), have been satisfied.  The time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration.

### III. DISCUSSION

The Parties do not dispute the existence of a contract but rather dispute whether the Policy covers Plaintiffs' water and mold damage.  Allstate argues summary judgment is proper because the loss to Plaintiff's Property was not "sudden" and is excluded under the Policy's seepage and leakage exclusion provision and mold exclusion provision.  (Doc. 25-2, at 12, 14, 16.)  In response, Plaintiffs argue the loss is covered because the initiation of the loss was sudden, Allstate fails to prove that an exclusion from the Policy applies, and even if an exclusion applied, an exception covers the loss.  (Doc. 30, at 9.)  The Court will address each argument below.

**A. Damage to Plaintiffs' Property was Not Sudden**

As stated above, the relevant Policy provision provides that "[Allstate] will cover sudden and accidental direct physical loss

10

argues the term "sudden" modifies the phrase "direct physical loss or damage" and not the "initiating event." (Doc. 25-2, at 13; Doc. 34, at 4.) The Court agrees with Allstate, and therefore, Mr. Welsh's opinion that the initiation was sudden does not support Plaintiffs' argument that the water and mold damage to their Property was sudden. (See Doc. 30-9, at 12-13.) According to Allstate, "the hot water heater leak started sometime between May 15, 2020 and June 16, 2020" based on Plaintiffs' increased electric bill. (Doc. 25-2, at 13.) However, on July 17, 2020 and July 24, 2020, Mobley Mechanical, while preparing estimates for Plaintiffs to replace their HVAC ductwork, "did not notice any signs of water standing or leaking [in the crawlspace]." (Doc. 30-2, at 2.) Yet, Plaintiffs' electricity bill continued to increase. (Doc. 31, at 3.) It was not until Mr. Cox went in the crawlspace on September 8 or 9, 2020, that he discovered the saturation and mold growth. (Doc. 32, at 2.) Ultimately, the water leak continued until Mr. Cox repaired it on September 25, 2020. (Doc. 25-2, at 14; Doc. 30, at 3.) Even assuming the water leak did not begin until Mr. Cox went in the crawlspace on September 8 or 9, 2020, it does not prove that the loss was sudden because the leak was ongoing until it was repaired on September 25, 2020. Moreover, as Plaintiffs' expert testified, there is no way of knowing how long it would take for the mold to form and the cupping of the wood floors would have taken some time. (Doc. 27-2, at 58, 71.) Therefore, the

12

Court finds that the loss or damage to Plaintiffs' Property resulting from the leak was not sudden.

Additionally in their response, Plaintiffs argue the denial letter "presumes the damage was initially covered, but then barred by an applicable exclusion" because it "only identifies exclusions to coverage" and does not deny based on the loss or damage as not sudden. (Doc. 30, at 10-11.) Allstate argues the Policy is controlling and not the denial letter, and moreover, failing to quote the "Losses We Cover Under Coverages A and B" provision in the denial letter was not a waiver, and it "cannot bring within the coverage of the Policy physical loss to the property which was not 'sudden.'" (Doc. 34, at 1-4.) The Court agrees it is "well-established . . . that the doctrines of implied waiver and estoppel, based upon the conduct or action of the insurer, or its agent, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom." Murrell v. Allstate Ins. Co., No. CV 113-053, 2014 WL 12656524, at *3 (S.D. Ga. July 8, 2014) (quoting Danforth v. Gov't Emps. Ins. Co., 638 S.E.2d 852, 858-59 (Ga. Ct. App. 2006)). Moreover, the Court finds Plaintiffs' argument regarding a presumption of coverage unconvincing. Plaintiffs do not point to any evidence or law that supports this proposition. (See Doc. 30, at 9-10.) Accordingly, the Court finds the Policy is controlling

and based on the Policy, the loss to Plaintiffs' Property was not sudden.

## B. The Policy Exclusions Bar Coverage

Allstate also moves for summary judgment on the basis that the loss to Plaintiffs' Property is explicitly excluded by two provisions in the Policy. (Doc. 25-2, at 14-17.) Plaintiffs argue an exception to the exclusion brings their loss under the Policy coverage. (Doc. 30, at 9-12.) The Court addresses each provision below.

### 1. Seepage and Leakage Provision

First, Allstate argues the loss is not covered under the seepage and leakage exclusion provision because "the leak was ongoing for more than 14 days." (Doc. 25-2, at 14-19; Doc. 34, at 5-8.) As stated above, the provision excludes coverage for loss caused by "[s]eepage, meaning continuous or repeated seepage or leakage over a period of weeks, months, or years, of water, steam or fuel." (Doc. 25-1, at 28.) According to Allstate, testimony of four witnesses support their argument: (1) Mr. Cox testified that he believes the water leak started at the latest September 10, 2020 but it was not repaired until 15 days later; (2) Mr. Terry Heaton, Allstate's expert, testified it would have taken at least three weeks for the leak to cause mold growth and cupping; (3) Mr. Williams, Allstate's adjuster, testified that he believed the leak occurred over a period of several months; and (4) Mr. Welsh,

14

Plaintiffs' expert, testified that the leak would have likely caused the increased water bill and that it would take time to cause the wood floors to cup from the moisture in the crawlspace. (Doc. 34, at 5-7.)  In response, Plaintiffs only challenge Mr. Heaton's opinion arguing that "[i]n order for [Allstate] to rely on the continuous or repeated seepage or leakage exclusion, it has to form an opinion on the conditions found in the crawlspace on the date of loss," but it is unable to do so because Mr. Heaton relies on photographs taken in October 2020.  (Doc. 30, at 11.)  However, Plaintiffs' argument is unavailing.  According to Plaintiffs, the first time they identified the water and mold was on or about September 8, 2020.  (Id.)  Allstate asserts the water leak began sometime between May 15, 2020 and June 16, 2020.  (Doc. 25-2, at 15.)  Nonetheless, even using Plaintiffs' date of September 8, 2020 as when the leak and mold growth started, seventeen days passed until the leak was found and repaired on September 25, 2020.  Therefore, the exclusion precludes coverage of the damage caused by the leakage over at least a seventeen day, two and a half week, period.  See Landrum v. Allstate Ins. Co., No. 5:18-CV-00458, 2019 WL 5068656, at *3 (M.D. Ga. Oct. 9, 2019), aff'd, 811 F. App'x 606 (11th Cir. 2020) (quoting Taylor v. Foremost Ins., No. 5:15-CV-164, 2017 WL 8777469, at *9 (M.D. Ga. Aug. 31, 2017)) (finding that "at least 14 days of seepage or leakage is required to trigger an exclusion, like the one here,

15

for seepage or leakage 'over a period of weeks, months, or years.'").

Plaintiffs also argue that even if the seepage and leakage provision excludes coverage, an exception to this exclusion brings their damage within the coverage.[2] (Doc. 30, at 9-10.) Allstate argues that the exception does not apply because there is no evidence as to what caused the water leak because Plaintiffs repaired the water line a week before they reported the loss to them, and "the exception to the exclusion does not provide for any coverage independent of already existing coverage." (Doc. 34, at 9-10.) The "burden of proving an exception to an exclusion lies

---

[2] The exception Plaintiffs rely on provides, in part:

> 5. a) Wear and tear, aging, marring, scratching, deterioration, inherent vice, or latent defect;
> b) mechanical breakdown;
> c) growth of trees, shrubs, plants or lawns, regardless or whether such growth is above or below the surface of the ground;
> d) rust or other corrosion;
> e) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs, or ceilings; or
> f) insects, rodents, birds, or domestic animals. We do cover the breakage of glass or safety glazing materials caused by birds.
>
> If any of a) through f) causes the sudden and accidental escape of water or steam from a plumbing, heating or air conditioning system, a household appliance or an automatic fire protective sprinkler system within your dwelling, we cover the direct physical damage caused by the water or steam.
>
> If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of your dwelling necessary to repair the system or appliance. This does not include damage to the defective system or appliance from which the water or steam escaped.

(Doc. 25-1, at 27-28.)

16

with the insured." Mock v. Cent. Mut. Ins. Co., 158 F. Supp. 3d 1332, 1347 (S.D. Ga. 2016) (citing LaFarge Corp. v. Travelers Indem. Co., 118 F.3d 1511, 1516 (11th Cir. 1997)). The provision Plaintiffs rely on specifically lists out the six causes that would fall under the exception. (Doc. 25-1, at 27-28.) However, Plaintiffs are unable to provide any evidence showing any of the six causes listed in the exception caused their water leak, and therefore, Plaintiffs have not met their burden of showing the exception applies. Accordingly, the exception to the exclusion does not apply.

2. Mold Provision

Second, Allstate argues that the Policy contains a specific exclusion for damage caused by mold. (Doc. 25-2, at 16-17.) In response, Plaintiffs argue that the Policy covers mold damage if it is caused by a covered water loss. (Doc. 30, at 10.) To the extent Plaintiffs seek coverage for damage caused by mold, the Court finds that the mold exclusion provision applies because the provision clearly states the Policy does "not cover any loss consisting of or caused by mold . . . ." (Doc. 25-1, at 27.) Because Plaintiffs do not raise an exception to this exclusion, the damage caused by mold is excluded by the Policy.

Moreover, for the mold resulting from the leak, the Policy clearly states coverage for mold remediation only if the cause of the mold is a covered water loss. (See Doc. 25-1, at 15 ("Mold,

17

Fungus, Wet Rot and Dry Rot Remediation As A Direct Result Of A Covered Water Loss.").) Because the Policy does not cover the loss caused by the leak, the mold resulting from that loss is also not covered.

## IV. CONCLUSION

For the foregoing reasons, Allstate's motion for summary judgment (Doc. 25) is **GRANTED**.[3] The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Allstate Vehicle and Property Insurance Company, **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 13th day of March, 2023.

                                                    _____
                                                    J. RANDAL HALL, CHIEF JUDGE
                                                    UNITED STATES DISTRICT COURT
                                                    SOUTHERN DISTRICT OF GEORGIA

---

[3] Plaintiffs argue that "since [Allstate] did not address Plaintiffs' bad faith claim in its Motion for Summary Judgment, Plaintiffs will not address it in [their] Response." (Doc. 30, at 8 n.1.) Nevertheless, because the Court is granting summary judgment for Allstate on Plaintiffs' breach of contract claim, there is no coverage for Plaintiffs' bad faith claim as a matter of law and it must also be dismissed. See Landrum, 2019 WL 5068656, at *4 n.9 (granting summary judgment for Allstate on Plaintiff's breach of contract claim and dismissing Plaintiff's bad faith claim because "there is no coverage as a matter of law."); see also Green v. Allstate Fire & Cas. Ins. Co., No. 2:15-CV-205, 2018 WL 2057356, at *5 (N.D. Ga. Mar. 27, 2018) ("A plaintiff may recover damages for a bad faith refusal to pay a claim for 'a loss which is covered by a policy of insurance....' O.C.G.A. § 33-4-6. Because Plaintiffs' loss is not covered by their insurance policy with Allstate, they cannot recover damages for Allstate's investigation of their claim and subsequent refusal to pay.")